# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

JOHN ROSS SILVA,                    )
                               )
      Movant,                   )
                               )
v.                                  )   Case No.   CV411-003
                               )                 CR409-110
UNITED STATES OF AMERICA,           )
                               )
      Respondent.               )

## REPORT AND RECOMMENDATION

John Ross Silva, presently incarcerated at Federal Correctional Institution La Tuna in Anthony, Texas, has filed a motion under 28 U.S.C. § 2255 challenging the 48-month sentence this Court imposed following the acceptance of his guilty plea to a charge of illegally selling night vision equipment belonging to the United States. (Doc. 1.)[1] For the following reasons, his § 2255 motion should be **GRANTED**.

## I.   BACKGROUND

Government agents built their case against Silva indirectly.

---

[1] Unless otherwise noted, citations are to the docket in Silva's civil § 2255 case, number CV411-003. "Cr. doc." refers to documents filed under his criminal case, CR409-110. Additionally, page references are to the CM/ECF screen page rather than the referenced document's own internal, printed pagination.

Initially, they pursued a man named Carl Williams, who they discovered was selling government-issued night-vision goggles over the internet. (Cr. doc. 36 at 8 (plea hr'g tr.).)   When they searched his home, they found several items that had been stolen from the Ft. Stewart military reservation.   (*Id.*)   Williams fingered Silva, who worked in optical instrument repair at the base.   (*Id.*)   He agreed to cooperate with the agents in building a case against Silva.   (*Id.*)   Agents later recorded a conversation between Williams and Silva setting up a deal for the sale of additional night-vision goggle components.   (*Id.*)   Williams wore a hidden recording device during the transaction.   (*Id.*)   He paid Silva $1000 with the understanding that he would later pay an additional $5000, and Silva gave Williams access to components that could be assembled into 20 full sets of night-vision goggles.   (*Id.* at 8-9.)   During a subsequent interview, Silva admitted that he had sold components for approximately 42 complete sets of night-vision goggles.   (Presentence Investigation Report ("PSI") ¶¶ 9-11.)

On April 4, 2009, Silva was indicted by a federal grand jury for

illegally selling United States property in violation of 18 U.S.C. § 641. [2]
(Cr. doc. 1.)    He entered a guilty plea on August 12, 2009, in
consideration of the government's promise to dismiss the charges in a
companion case, *United States v. Silva*, No. CR209-026 (S.D. Ga. Aug. 17,
2009).   (Cr. doc. 28 (plea hr'g minutes).)   In that case Silva was charged
with fraudulent use of an access device and aggravated identity theft in
defrauding his parents.   (Tr. 33.)   He was sentenced on January 28,
2010.   (Cr. doc. 32 (sentencing minutes).)

According to the probation officer assigned to the case, Silva faced a
12 to 18 month sentencing range under the United States Sentencing
Guidelines ("U.S.S.G."), but he recommended an upward departure since
the Guidelines did not account for the fact that defendant sold sensitive
military equipment which was later sent overseas in a time of war and
could conceivably end up in enemy hands.[3]   (PSI ¶¶ 57 & 68.)   The PSI
recommended a sentence of 24 months in order to account for this

---

[2] Silva was initially released on bond (cr. doc. 6), but it was later revoked (cr.
doc. 20) when Silva threatened two of his old co-workers at the base.   (Tr. 3; cr. doc.
19 (gov't's motion to revoke bond).)

[3] Twelve of the night-vision goggles made it to Slovakia.   (Cr. doc. 37 at 45-46.)

aggravating circumstance.   (*Id.* ¶ 68.)   The sentencing judge declined to impose a Guidelines departure and instead varied from the Guidelines under 18 U.S.C. § 3553(a).[4]   (Cr. doc. 37 (sent'g hr'g tr.) at 47-53.)   He discussed his reason for the variance at length:

> In a time of war the theft and sale of such technology, which is so important to the superiority of our troops in the field, achieves a much more serious level.   When it is combined with Internet sales of this technology, which can be achieved virtually anywhere in the world, and which in this case were in fact sold abroad, and the fact that these were not just a few cathode tubes or other pieces, but enough components to make complete units, and indeed intended to be sold as complete units, coupled with the fact that this was done by a veteran of the United States Navy, who probably learned his repair skills at the expense of the government, and who had a sensitive supply and logistics repair position, while I can't call this treason and don't intend to, it certainly has a fragrance reminiscent of the odor of treason. . . .   The guidelines are driven only by the amount; they're not taking into account the type of equipment stolen, the sensitivity of it, the potential for combining night vision goggles on the head of an insurgent holding an RPG looking at one of our helicopters at night.   The guidelines don't think about those things.   The guidelines, in my view, in this case are not appropriate.

(*Id.* at 50-51.)   Consequently, he ordered Silva imprisoned for 48 months.   (*Id.* at 53.)

---

[4] The Guidelines permit upward departures pursuant to U.S.S.G. § 5K2.0, but the sentencing judge also has the authority to vary from the Guidelines entirely after considering the factors listed in 18 U.S.C. § 3553(a).   Here, the sentencing judge did the latter.

Silva did not appeal his sentence.   Instead, he filed the instant §
2255 motion raising three claims, including a claim that his attorney
failed to consult with him about filing an appeal in violation of *Roe v.
Flores-Ortega*, 528 U.S. 470, 477 (2000).   (Doc. 1 at 4.)

## II.   ANALYSIS

Under *Flores-Ortega* and its progeny, counsel has a duty "to consult
with the defendant about an appeal when there is reason to think either
(1) that a rational defendant would want to appeal (for example, because
there are nonfrivolous grounds for appeal), or (2) that this particular
defendant reasonably demonstrated to counsel that he was interested in
appealing."   *Flores-Ortega*, 528 U.S. at 478-80.   The government
concedes that there existed a duty to consult in this case.   (Tr. 72.)
When such a duty arises, counsel renders deficient performance either by
failing to consult or by failing to "adequately" consult.[5]

---

[5] Under *Strickland v. Washington*, 466 U.S. 668 (1984), a "defendant claiming
ineffective assistance of counsel must show (1) that counsel's representation 'fell
below an objective standard of reasonableness,' . . . and (2) that counsel's deficient
performance prejudiced the defendant . . . ." *Flores-Ortega*, 528 U.S. at 476-77
(quoting *Strickland*, 466 U.S. at 688).

At the hearing, the Court heard testimony from Silva, his father, and his attorney, John Stephen Wetzler.   Many of the facts are undisputed.   For instance, both parties agree that there was some level of consultation, for Wetzler spoke to Silva just after sentencing and advised him that there was nothing to appeal.   (Tr. 15 & 52.)   The question, then, is whether this consultation was adequate.   Applying *Flores-Ortega*, the Eleventh Circuit has explained that proper consultation "requires informing a client about his right to appeal, advising the client about the advantages and disadvantages of taking an appeal, *and* making a reasonable effort to determine whether the client wishes to pursue an appeal, regardless of the merits of such an appeal." *Thompson v. United States*, 504 F.3d 1203, 1206 (11th Cir. 2007) (emphasis in original).   An attorney should also make a reasonable effort to explain the appellate process.   *Id.* at 1207.   "Simply asserting the view that an appeal would not be successful does not constitute 'consultation' in any meaningful sense."   *Id.*

Here, both Wetzler and Silva were surprised by the variance and the hefty sentence.   (Tr. 15 & 53.)   Both testified that they briefly

discussed an appeal after the sentence was pronounced.   (Tr. 27 & 44.) As noted above, both agree that Wetzler ultimately advised Silva that there was nothing to appeal.   Silva, who presented as a sophisticated and intelligent witness, testified that he took Wetzler's statement to mean that he had no right to appeal.   (Tr. 18, 65.)   The Court does not credit that testimony.   The sentencing judge explicitly advised Silva of his right to appeal.   (Cr. doc. 37 at 56.)   The record, taken along with Silva's demeanor at the hearing, leads the Court to find that he understood the judge's advice and did not believe that his attorney could somehow overrule the judge.   The Court also credits Wetzler's testimony that he spent a few minutes discussing the possibility of an appeal rather than merely stating that there was nothing to appeal, as Silva suggested.

But the exchange was brief and far from detailed, and nothing in the record shows that Wetzler explained the intricacies of the appellate process to Silva.   The lack of detail and brief duration are factors that cut against a finding that the consultation was adequate.   *See Thompson*, 504 F.3d at 1207 & n.7 ("While not dispositive, the short duration of the exchange is a relevant factor which, in this case, weighs against finding

adequate consultation as a matter of law."). More fundamentally, the advice that Wetzler did impart was so misleading that Silva could not have made an informed decision on the matter.

When discussing the advantages of taking an appeal, Wetzler stated that he told Silva he could conceive of no grounds and no advantages. But given the relative severity of the variance, one potential avenue of attack immediately leaps to mind. A reasonably prudent attorney standing in Wetzler's shoes would at least explain to his client that he could raise a claim that the sentence was substantively unreasonable. *See United States v. Gonzalez-Visoso*, 2011 WL 5041709 at *2 (11th Cir. Oct. 25, 2011) (the Eleventh Circuit vacates outside-of-the-Guidelines sentencing variances where there is the "'definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside of the range of reasonable sentences dictated by the facts of the case.' *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc). . ."); (*see* doc. 1 at 5 (Silva's Ground Two claim that the sentence violated procedural and substantive due process)). Admittedly, defendants rarely

8

win on such claims, but it was certainly a non-frivolous issue that could have been taken before the court of appeals.   And had it succeeded, there is some chance that Silva would have been resentenced within the Guidelines.   In other words, there was at least one glaringly obvious, non-frivolous issue that, while unlikely to succeed, could have benefited Silva.   Wetzler never discussed it.   He thus failed to flesh out the potential advantages of taking an appeal.

As for disadvantages, Wetzler states that he told Silva that he could lose acceptance of responsibility under the PSI and face the reinstatement of the dismissed state charges involving Silva' parents. (Tr. 44-45.)   Both concerns are overblown.   The Court is unaware of any authority supporting the proposition that filing an appeal is inconsistent with acceptance of responsibility.   *See United States v. Smith*, 127 F.3d 987, 989 (11th Cir. 1997) (en banc) (noting that a district judge may deny an acceptance of responsibility reduction based upon conduct inconsistent with acceptance of responsibility).   Moreover, even if Silva won on appeal and was resentenced within the Guidelines range without an adjustment for acceptance of responsibility, he still would

have received a sentence shorter than 48 months.[6]  As for the second point, absent a violation of the plea agreement or the successful withdrawal of the guilty plea, there was no chance that the dismissed charges would be resurrected.  *Cf. United States v. Whitlow*, 287 F.3d 638 (7th Cir. 2002) (when a defendant violates a plea agreement by appealing despite a promise not to do so, the government may reinstate dismissed charges); *United States v. Hare*, 269 F.3d 859 (7th Cir. 2001) (same).   Even the government admitted, later at the hearing, that the dismissed charges couldn't be resurrected absent a successful motion to withdraw his guilty plea.  (Tr. 69 ("THE COURT: -- How would a successful appeal -- how would an appeal jeopardize the plea agreement? MR. TANNER:  Well, it would depend on what you raised on appeal. But, you know, . . . there may be some indication that he was so upset about the sentence that he would want to try to withdraw his guilty plea or claim that his guilty plea was involuntary. . . .   And you're right, Your

---

[6] With acceptance of responsibility, Silva's total offense level was 13 and his criminal history was category I, giving a Guideline range of 12-18 months.   (PSI ¶ 56.) Without acceptance of responsibility, Silva's offense level would rise to 16, giving an advisory range of 21-27 months, considerably shorter than the sentence he received. USSG Sentencing Table.

Honor, that typically speaking you would just have a resentencing.").) To the extent Wetzler conveyed these "disadvantages," his advice was again deficient.[7]

Wetzler also offered seemingly contradictory testimony when asked whether he ever explicitly asked Silva if he wanted to appeal. He initially indicated that he could not recall whether he had asked Silva but later changed his testimony, stating that he always told clients "if you want me to appeal, I'll do whatever you want." (Tr. 51 & 53.) Of course, that was a statement, not a question. He never directly asked Silva whether he wanted to appeal, and Silva never gave a direct yes or no answer.

In sum, Wetzler short-timed the consultation, offered questionable advice as to appellate advantages and disadvantages, and failed to ask Silva directly whether he wanted to appeal. He simply did not provide Silva with sufficient information regarding his appellate rights, and he made no reasonable effort to discover Silva's informed wishes regarding

---

[7] That is not to say there were no disadvantages. A court at resentencing could impose the same sentence or higher supported by additional reasons for a variance that might prove acceptable on appellate review. Hence, there was a risk to appealing. Wetzler never explained that risk.

an appeal.   *Thompson*, 504 F.3d at 1207.   Wetzler thus performed deficiently under *Strickland*'s first prong.

The prejudice showing under *Strickland's* second prong, *see supra* note 5, is minimal since counsel's failure to properly advise a client about an appeal or to file an appeal on his behalf necessarily renders an entire stage of the criminal process "nonexistent."   A movant need only show that it was reasonably likely he would have pursued an appeal; he does not need to show that he had any meritorious claims, much less any chance of success.   *Flores-Ortega*, 528 U.S. at 484.   The Court credits Silva's testimony that he would have appealed if properly advised by counsel. After all, he received a surprise sentence that was four times as long as the minimum prescribed by the Guidelines.[8]   (PSI ¶ 56.)

## III.  CONCLUSION

To summarize, counsel had a duty to consult with Silva regarding an appeal, he failed to do so with the meaning of *Flores-Ortega*, and that

---

[8] Silva also insists that he wanted to correct the sentencing judge's misunderstanding of the night-vision equipment at play. (Tr. 23-24.) According to Silva, the equipment was worthless for firing weapons. (*Id.*) He admitted, however, that the equipment still provided an advantage on the battlefield. (Tr. 27.)

failure prejudiced movant. Silva's § 2255 motion, therefore, should be **GRANTED** so that he may pursue an out-of-time direct appeal. Since Silva has won an out-of-time appeal, the Court declines to reach his remaining grounds for relief.

The Eleventh Circuit set forth the procedure courts are to follow when granting out-of-time appeals in *United States v. Phillips*, 225 F.3d 1198, 1201 (11th Cir. 2000). Pursuant to *Phillips* (1) the judgment in movant's criminal case should be vacated; (2) the Court should enter a new judgment imposing the same sentence; (3) movant should be informed of all of his rights associated with filing an appeal of his reimposed sentence, and (4) movant should be advised that he has fourteen days from the date of the re-imposition of his sentence to file a timely appeal in accordance with Rule 4(b)(1)(A)(i) of the Federal Rules of Appellate Procedure. *Id.* As it is clear that Silva desires to appeal, the Court should instruct the Clerk to file a notice of appeal on his behalf as soon as the new judgment is entered. Because Silva is entitled to the assistance of counsel on direct appeal, the attorney appointed to represent Silva during the § 2255 evidentiary should continue to represent him on

appeal.

**SO REPORTED AND RECOMMENDED** this   16th   day of

November, 2011.

_____

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA